IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| United States, | ) | Cr. No. 06-00198 SOM |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING DEFENDANT'S |
| | ) | MOTION TO SUPPRESS ITEMS OF |
| vs. | ) | EVIDENCE |
| | ) | |
| Douglas Gilman, Jr.,    (02) | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS ITEMS OF EVIDENCE

I.      INTRODUCTION.

        Defendant Douglas Gilman, Jr. ("Gilman" or "Douglas
Gilman"), moves to suppress evidence seized by the Government
during a search of a shed on his residential property located at
67-423 Goodale Avenue, Waialua, Hawaii.  On June 21, 2005,
Federal Bureau of Investigation agents searched the shed pursuant
to a search warrant authorizing a search of Gilman's "residence."
The Government argues that the shed falls within the curtilage of
the residence and so was covered by the warrant.  Gilman argues
that the shed falls outside the curtilage.  Gilman also argues
that the shed, while not within the curtilage, was also not in an
open field, and that, given his legitimate expectation of privacy
in the shed, the agents violated his Fourth Amendment rights by
searching the shed without a warrant.  This court disagrees with
the Government and concludes that the shed is not part of the
curtilage and was not covered by the warrant.  The court also
rejects the Government's reliance on the good faith exception to

the exclusionary rule.  Because the shed was not covered by the warrant, the court suppresses all evidence seized from the shed. The court therefore grants Gilman's motion.

II.      FINDINGS OF FACT.

On April 18, 2007, this court conducted a hearing on the present motion.  At the hearing, the court admitted Government's Exhibits 1 through 9.  The only live testimony was by FBI Agent Jeff Rutherford ("Agent Rutherford").  Based on the parties' memoranda and exhibits, Rutherford's live testimony, and the warrants and application that this court takes judicial notice of, the court finds the following by a preponderance of the evidence:[1]

1.   On June 15, 2005, M.D. McDonald ("Special Agent McDonald"), an FBI Special Agent, submitted an application and affidavit for warrants to search four residential properties. See generally Application and Affidavit for Search Warrant ("Warrant Application").  In the affidavit, Special Agent McDonald averred that Gilman's father "is the leader of a criminal organization largely controlled by members of the Gilman family," including Gilman and his two brothers, Charles Gilman and William Gilman.  Id. at 24.  Special Agent McDonald also stated:

---

[1] Findings of fact and conclusions of law are presented in numbered paragraphs for ease of reference in future proceedings.

2

> I believe that Douglas Gilman, Jr. provides
> assistance to the illegal gambling business.
> I believe that while Charles Gilman is the
> public figure who handles much of the illegal
> gambling business, Douglas Gilman, Jr.
> assists his father in a less public capacity
> in making decisions and controlling the
> intake and expenditure of money flowing
> through the illegal gambling business.

Id. at 26.  Regarding William Gilman, Special Agent McDonald

stated, "I believe that William Gilman stores at his residence

much of the equipment used for the chicken fights and gambling

activities."  Id. at 26.

2.   That same day, Magistrate Judge Kevin S.C. Chang

signed each of the four warrants.  Ex. 1 (attached to Opp.) at 1.

The warrant authorizing a search of Douglas Gilman's residence

included "Attachment A," which described the premises to be

searched as:

> 67-423 Goodale Avenue, Waialua, Hawaii, the
> residence of Douglas Gilman, Jr.  The
> location to be searched is a green, one-story
> residential structure with white trim.  A
> photograph of the structure is attached
> hereto (the page containing the photograph is
> not numbered).
>
>      All motor vehicles located at the
> location at the time of the search.

Ex. 1 (attached to Opp.) at 2.  "Attachment B" listed the items

to be seized from Gilman's residence, which included:  "Indicia

of a chicken fighting operation including but not limited to the

following:  scales, schedules, bills for the rental of tents,

photographs of chicken fighting events, 'pay-out' sheets, knives,

3

spurs, 'gaffs' or similar instruments."  Ex. 1 (attached to Opp.) at 4.

3.   Unlike the warrant governing Douglas Gilman's property, the warrant authorizing a search of William Gilman's property expressly authorized the search of "sheds."  Warrant Application at 54.  That warrant described the premises to be searched as:

> 66-320 Paalaa Road, Haleiwa, Hawaii, the residence of William Gilman.  The site is a one-story, white residential structure with red trim and multiple car ports and at least one shed.  Photographs of the structure are attached hereto (the pages containing the photographs are not numbered).
>
> In addition to the residence itself, the search is to encompass all carports, <u>sheds</u> and tents adjacent to the house and all motor vehicles located on the property at the time of the search.

Warrant Application at 54 (emphasis added).

4.   On June 21, 2005, FBI agents executed the search warrant at Douglas Gilman's property.  Motion at 1; Opp. at 3. The agents searched Gilman's home, and one of the agents directed Gilman to open a locked shed.  Opp. at 3; Declaration of Douglas Gilman, Jr. (12/26/2006) ("Gilman 12/26/2006 Decl'n") ¶ 7. According to Agent Jeff Rutherford, before unlocking the shed, Gilman told the FBI agents that the shed was used to store tools. After Gilman unlocked the shed, the agents entered it and recovered:  (1) "Four Scales"; (2) a "Duffle Bag w/ Decks of

4

Cards, Dice, Dice Cups"; and (3) a "Duffel Bag w/ Decks of Cards."  Motion at 2.

5.   Gilman's property is on Goodale Avenue.  Aerial photographs of Gilman's property show small suburban house lots located to the east of Goodale Avenue.  Exs. C, D, E.  To the west of Goodale Avenue, the plots of land are larger rural lots. Id.  Gilman's property is one of the larger lots on the west side of Goodale Avenue.  Id.

6.   A concrete driveway runs through Gilman's property beginning at the street and ending at Gilman's home.  Gilman 12/26/2006 Decl'n ¶ 5; Exs. C-E.  The shed sits on the east side of the driveway near the entrance of the property.  Gilman 12/26/2006 Decl'n ¶ 5; Exs. C-E.  Between the shed and the home, the driveway forks, "with the [home] sitting in the middle of the two legs of the roadway."  Gilman 12/26/2006 Decl'n ¶ 5; Exs. C-E.

7.   At the hearing on this matter, the parties agreed on the boundaries of Gilman's property for purposes of the present motion.  The parties agreed that the east side of Gilman's property is bordered by Goodale Avenue and that the west side of the property is bordered by a dirt road that runs parallel to Goodale Avenue.  See Ex. C.  The south side of Gilman's property is bordered by a dirt road directly south of Gilman's home that runs east and west.  See Ex. C.  The north

side of Gilman's property is bordered by a dirt road that begins at Gilman's driveway and curves south before connecting to the dirt road to the west.  See Ex. C.

8.   It is undisputed that the shed on Gilman's property is 130 feet from Gilman's home, as measured between the closest points between the two structures.  Gilman 12/26/2006 Decl'n ¶ 3.  It is also undisputed that the shed is "used to store lawn and garden equipment and tools," that the shed is "kept closed and locked," and that the shed was "closed and locked" when the warrant was executed.  Id. ¶¶ 4, 7.  The parties agree that the shed is visible to passers-by.  Id. ¶ 6; Opp. at 12.

9.   The shed is a single-story structure that is painted green with white trim, as is Gilman's home.  Government's Exs. 2-3, 5-8.  The front of the shed has two large doors, and two other doors are visible on the west side of the shed.  Government's Exs. 5-8.  Gilman says that the two doors contain toilets, but that he and his family "never use the toilets in the shed."  Id. ¶ 4; Declaration of Douglas Gilman, Jr. (2/2/2007) ¶ 4.  No windows are on the front of the shed, but windows are on all other sides of the shed.  Government's Exs. 5-8.  Agent Rutherford testified that the windows are high enough off the ground that a person who is just a little over five feet tall

would be too short to see into the windows, although someone six feet tall could peer in.

10.   The numbers of Gilman's street address, "67-423," are affixed to the front of the shed, which faces Goodale Avenue. Government's Exs. 5-6.  Electrical outlets and sensor lights, as well as an electricity box and telephone box, are located on the outside of the shed.  Government's Exs. 5-8.  Agent Rutherford testified that the presence of the electrical and telephone boxes does not definitively indicate that the shed has power or phone service, but that their presence indicates that the shed might have power or phone service.

11.   Immediately in front of and on the sides of the shed are:  a trash can, a plastic chair, a folded beach chair, a shovel, two hoses, several plants, and several pieces of wood. Government's Exs. 5-6.  Another trash can, several plants, and an unknown tool are directly behind the shed.  Government's Ex. 8.

III.     CONCLUSIONS OF LAW.

        A.   The Shed is Not Part of the Curtilage of
             Gilman's Home.

1.   This case turns the usual curtilage analysis on its head.  In the typical case in which curtilage is an issue, the Government argues that evidence obtained through a search not authorized by a warrant was admissible because the premises searched, not being part of the curtilage of a residence, did not require a warrant.  See, e.g., United States v. Dellas, 355 F.

7

Supp. 2d 1095, 1101-02 (N.D. Cal. 2005) ("The government bears
the burden of proving that the search was not within the
curtilage of a defendant's home." (citing <u>United States v.
Johnson</u>, 256 F.3d 895, 901 (9th Cir. 2001) (en banc)))).   In
other words, falling within the curtilage typically means
property is protected from a warrantless search, and evidence
from such a search is suppressed.   Here, the Government argues
that, because the shed was within the curtilage and therefore
covered by a warrant to search the residence, evidence recovered
from the shed is admissible.

      2.   The Government's argument relies on the basic
premise that the Fourth Amendment's protection against
warrantless searches extends to the curtilage around one's home.
<u>See</u> <u>Johnson</u>, 256 F.3d at 901; <u>see also</u> <u>United States v. Depew</u>, 8
F.3d 1424, 1426 (9th Cir. 1993) ("Although the Fourth Amendment's
protection is accorded only to 'persons, houses, papers, and
effects' and not to 'open fields,' the Fourth Amendment does
protect the 'curtilage' of a home."), <u>overruled on other grounds
by</u> <u>Johnson</u>, 256 F.3d at 913 n.4.   "The curtilage inquiry requires
a court to determine whether an area 'harbors those intimate
activities associated with domestic life and the privacies of the
home.'"   <u>United States v. Traynor</u>, 990 F.2d 1153, 1156 (9th Cir.
1993), <u>overruled on other grounds by</u> <u>Johnson</u>, 256 F.3d at 913
n.4.

3.   The Ninth Circuit recognizes that "the Fourth Amendment is not violated by a search of the grounds or outbuildings within a residence's curtilage where a warrant authorizes a search of the residence."  United States v. Cannon, 264 F.3d 875, 880 (9th Cir. 2001); United States v. Gorman, 104 F.3d 272, 274 (9th Cir. 1996) ("If a search warrant specifying only the residence permits the search of 'closets, chests, drawers, and containers' therein where the object searched for might be found, so should it permit the search of similar receptacles located in the outdoor extension of the residence, i.e., the curtilage . . . .  To hold otherwise would be an exercise in pure form over substance.").

4.   "Every curtilage determination is distinctive and stands or falls on its own unique set of facts."  Depew, 8 F.3d at 1426.  In United States v. Dunn, 480 U.S. 294, 301 (1987), the Supreme Court stated that questions of curtilage should be

> resolved with particular reference to four factors:  the proximity of the area claimed to be curtilage to the home, whether the area is included in an enclosure surrounding the home, the nature of the uses to which the area is put, the steps taken by the resident to protect the area from observation by people passing by.

These factors "cannot be mechanically applied, but are merely useful analytical tools to determine whether an area is to be protected from unconstitutional searches and seizures."  Johnson, 256 F.3d at 901 (quoting Dunn, 480 U.S. at 301).

9

5.   The Government's only argument against suppressing the evidence obtained from Gilman's shed is that the shed falls within the curtilage of Gilman's home and is therefore covered by the search warrant.

### The First Dunn Factor:  Proximity of the Shed to the Home

6.   Gilman argues that the distance between his home and the shed is substantial and weighs in favor of finding that the shed falls outside the curtilage of his home.  Motion at 4. The Government points out "the importance of considering whether the area in question is in a rural, urban, or suburban setting." Opp. at 7.  According to the Government, because Gilman's property is in "a rural setting," the proximity of the shed to his home weighs in its favor.  Opp. at 7-9.  The court concludes that this factor creates no inference that the shed falls within the curtilage of Gilman's home.

7.   Generally, "there is not any fixed distance at which curtilage ends."  Johnson, 256 F.3d at 902.  "It must be determined on a case-by-case basis."  Id.  The Ninth Circuit recognizes that the size of a particular curtilage depends on whether the home is located in an urban, suburban, or rural area:

> The realities of rural country life dictate
> that distances between outbuildings will be
> greater than on urban or suburban properties
> and yet still encompass activities intimately

>           associated with the home; this is the nature
>           of the "farmstead."

Johnson, 256 F.3d at 902.

8.   In Dunn, 480 U.S. at 297, law enforcement officials made a warrantless entry onto the defendant's rural ranch, which spanned approximately 198 acres.  After one of the officers smelled what he believed to be phenylacetic acid coming from the direction of two barns on the property, the officers peered into both barns.  Id. at 297-98.  The officers observed only empty boxes in the first barn, but observed a phenylacetone laboratory in the second barn, which was 60 yards from the defendant's home.  Id. at 297-98, 302.  In addressing the "proximity of the [barn] to the home," the Supreme Court stated that the distance of 60 yards between the barn and the home "supports no inference that the barn should be treated as an adjunct of the house."  Id. at 301-02.

9.   The shed on Gilman's property is 130 feet from his home.  Gilman 12/26/06 Decl'n ¶ 3.  Although Gilman's property is one of the larger lots on Goodale Avenue and appears to be a rural lot itself, it is not nearly as large as the 198-acre ranch at issue in Dunn.  However, the distance between Gilman's shed and home is smaller than the distance between the barn and the residence in Dunn.  Therefore, even assuming that Gilman's property is situated in a rural area, as in Dunn, the distance between the shed and Gilman's home supports no inference that the

11

shed should be treated as part of the curtilage of Gilman's home. See Dunn, 408 U.S. at 302; see also Johnson, 256 F.3d at 916 ("our cases have generally regarded the area around a structure 120 feet from the house to lie outside the curtilage" (internal citation omitted)) (Kozinski, J., concurring).

The Second Dunn Factor:  Enclosure of the Home and Shed

10.  With respect to the second Dunn factor, Gilman argues that the "shed is not included within an enclosure surrounding [his] residence."  Motion at 4.  Gilman contends that his home is separated from the shed by his driveway, which he says "physically demarks the yard around [his] residence." Motion at 5.  The Government responds that Gilman's home and the shed are enclosed by a "natural 'boundary' or 'mowing pattern' of the ground upon which the residence and the shed are located." Opp. at 9.  Because no fence or other enclosure surrounds Gilman's home and/or shed, this factor creates no inference that the shed is part of the curtilage of Gilman's home.

11.  The second Dunn factor analyzes whether the searched area is included within an enclosure surrounding the home.  Johnson, 256 F.3d at 902.  "For most homes, the boundaries of the curtilage will be clearly marked; and the conception defining curtilage--as the area around the home to which the activity of home life extends--is a familiar one easily understood from our daily experience."  Id.  "[F]encing

12

configurations are important factors in determining curtilage."
Id.  In rural areas, "natural boundaries such as thick trees or
shrubberies may also indicate an area 'to which the activity of
home life extends.'"  Id. (noting that hedgerows and thick trees
may create a sufficient enclosure to determine curtilage).  The
proper focus of this factor is whether a fence or natural
boundary "clearly demarcates the curtilage."  Traynor, 990 F.2d
at 1159.

        12.  In United States v. Shates, 915 F. Supp. 1483,
1486 (N.D. Cal. 1995), law enforcement officers received a tip
from a confidential informant that a methamphetamine lab was in
operation on the defendant's 160-acre ranch.  The officers
entered the ranch without a warrant.  Id.  While on the property,
the officers "smelled the odor of growing marijuana," "heard the
sound of a generator," and "heard the sounds of ballasts and
fans."  Id. at 1496-97.  Based on the informant's tip and the
officers' observations, the officers obtained a warrant to search
the defendant's property.  Id.  Upon executing the warrant, the
officers seized 1,433 marijuana plants from a "grow structure"
located about 105 feet from the defendant's trailer residence.
Id. at 1487, 1490, 1499.

        13.  The defendant moved to suppress all evidence
obtained during the execution of the search warrant on the ground
that the warrant was invalid because it was based on observations

that violated the Fourth Amendment.  Id. at 1485.  The district

court adopted the magistrate judge's findings and recommendations

and denied the motion to suppress.  Id.  As to the second Dunn

factor, the court stated:

> Looking at the pictures, the grow structure
> could be considered "enclosed" on the
> southerly side by [another structure on the
> property]; "enclosed" on the western side by
> the ingress and egress route to and from the
> trailer; "enclosed" by the generator shed on
> the northerly side; "enclosed" by the trees
> on the north and west.  But, this overly-
> broad interpretation should not be applied,
> since the enclosure usually has to be an
> objective manifestation of an intent to keep
> something private (like a fence).

Id. at 1501.  The court also noted that, although a forest

bordered the northern side of the property, the forest was "not

impenetrable . . . nor does it share any similarities with a

fence designed to enclose a home."  Id. at 1488.  The court

stated that the trees "are more akin to a mow line than to a

fence."  Id.  "In a curtilage analysis, a fence may weigh more

heavily in favor of a finding of curtilage, whereas a mow line

weighs far less heavily."  Id.

14.  No fences surround Gilman's home or shed.

Further, although the driveway connects the shed to Gilman's

home, neither the shed nor the home is enclosed by the driveway.

Thus, unlike a fence that might surround a home and its

curtilage, the driveway is not determinative of "whether the

14

[shed] is included within an enclosure surrounding the home."
See Johnson, 256 F.3d at 902.

15.   Similarly unpersuasive is the Government's
argument that an alleged "natural boundary" of "large trees and
other vegetation" encloses the home and shed.  Exhibit C, which
is an aerial photograph of Gilman's property, shows that the
property contains several large trees scattered along the
driveway and behind Gilman's home.  See Ex. C; see also Ex. A.
Exhibit A also shows overgrown vegetation behind the home.
Ex. A.  However, these trees and vegetation do not appear to
enclose the shed and/or home at all.

16.   The Government also argues that the home and shed
are enclosed by a "mowing pattern of the ground upon which the
residence and the shed are located."  In other words, the
Government contends that the home and shed are enclosed by a
manicured lawn.  This "mowing pattern" is evident in Exhibit A,
which shows a stark contrast between the green grass near the
home and shed and the dead grass in the foreground.  If the dead
grass were part of Gilman's property, the Government's argument
that the "mowing pattern" encloses the curtilage might have
merit.  However, at the hearing on this matter, the Government
conceded that Gilman's property excludes the dead grass shown in
the foreground of Exhibit A.  Thus, it appears that the "mowing
pattern" of manicured grass covers Gilman's entire property and

does not "clearly demarcate[] the curtilage."  See Traynor, 990
F.2d at 1159.

17.   The driveway, trees, vegetation, and "mowing
pattern" are "not impenetrable" and do not "share any
similarities with a fence designed to enclose the home."  See
Shates, 915 F. Supp. at 1488.  Because the home and shed are not
enclosed by a fence or natural boundary, this factor creates no
inference that the shed is part of the curtilage of Gilman's
home.

The Third Dunn Factor:  The Nature of the Shed's Uses

18.   Gilman argues that, because he "uses the shed
primarily for storing lawn and garden equipment and tools," the
third Dunn factor weighs in favor of finding that the shed falls
outside the curtilage of his home.  Motion at 6-7.  The
Government argues that the shed falls within the curtilage of
Gilman's home because the shed has sensor lights and electrical
outlets on the outside of the shed, has two toilets in the shed,
has the numbers of Gilman's street address affixed to its front,
and is "painted in the same green color with white trim" as
Gilman's home.  Opp. at 10.  Because the officers had no
objective information indicating that Gilman used the shed for
illegal activities before they entered the shed, this factor
weighs in favor of finding that the warrant did not cover the
shed.

16

19.   In <u>United States v. Santa Maria</u>, 15 F.3d 879, 880(9th Cir. 1994), Border patrol agents, who were "looking for aliens and drugs along a trail well traveled with both," followed a fresh set of tracks to the defendant's property.  The agents saw a mobile home and a nearby trailer on the defendant's property and, without a warrant, followed the tracks to the trailer.  <u>Id.</u>  The agents asked the defendant to open the trailer, where they found 357 pounds of marijuana.  <u>Id.</u> at 880-81.  The defendant moved to suppress all evidence obtained by the agents, but the district court denied the motion.  <u>Id.</u>  On appeal, the Ninth Circuit concluded that the trailer, which was "a locked unit which housed tools, a chainsaw, and an aquarium in addition to burlap sacks of marijuana," fell outside the curtilage of the defendant's nearby home.  <u>Id.</u> at 883; <u>see also</u> <u>Johnson</u>, 256 F.3d at 918 ("a shed is not generally known for housing the intimate activities of domestic life") (Kozinski, J., concurring).

20.   It is well settled in the Ninth Circuit that officers lacking objective information about the contents of an outbuilding may not enter it.  For example, in <u>Johnson</u>, 256 F.3d at 898, law enforcement officers "broke into [the defendant's] fenced and locked residential yard on his rural Washington property without a warrant" in an attempt "to apprehend another person who was a misdemeanor suspect last seen 30 minutes

previously and whose whereabouts were unknown."  While on the
defendant's property, the officers followed a trail to a locked
shed.  Id. at 900.  When the officers were within a few feet of
the shed's door, one of the officers "smelled what he knew from
training was marijuana."  Id.  The officers eventually left the
property and, based on their observations, obtained a warrant to
search the defendant's property for drugs.  Id.  Upon execution
of the warrant, the officers recovered 553 marijuana plants.  Id.
The defendant moved to suppress the evidence seized during the
search, and the district court denied the motion.  Id.

21.  On appeal, the Ninth Circuit was faced with
determining whether the shed was a part of the curtilage of the
defendant's home.  Id. at 903.  With respect to the third Dunn
factor, the court stated, "Dunn requires that when determining
the 'use' of an area, the officers cannot rely, as was done in
this case, exclusively on information they learn after the search
begins."  Id.  The court recalled that, in Dunn, "although the
Supreme Court relied on information obtained both before (aerial
photographs) and after (smell of phenylacetic acid) the search
began, it emphasized that it found 'especially significant' the
fact that the law enforcement officials possessed 'objective
data' that the barn in question was used to manufacture drugs
before entering the property."  Id. (quoting Dunn, 480 U.S. at
302).  Thus, in Johnson, the Ninth Circuit found it significant

that the police officers "possessed no objective data that the
[shed] was not used for intimate activities associated with the
home" before beginning their search.  Id.; see also Traynor, 990
F.2d at 1158 ("It is especially significant that the law
enforcement officials possessed objective data indicating that
the barn was not being used for intimate activities of the
home."); United States v. Van Damme, 48 F.3d 461, 464 (9th Cir.
1995) ("The greenhouse compound lacked any 'indicia of activities
commonly associated with domestic life.").  The Ninth Circuit
also noted, "We have never held that an officer lacking any prior
objective knowledge of the use of an outbuilding may approach it
free of Fourth Amendment constraints."  Johnson, 256 F.3d at 903.

        22.  Similarly, in Depew, 8 F.3d at 1425, law
enforcement officials were investigating the production and sale
of marijuana by Martin Levine ("Levine").  One of the officers
received a tip that a person nicknamed "Pepe" had assisted Levine
in establishing his growing operation.  Id.  The officers
discovered that the defendant used the alias "Pepe" and had
previously been convicted of manufacturing marijuana.  Id.
Without obtaining a warrant, one of the officers went to the
defendant's residence and met with the defendant "outside the
garage in the driveway approximately six feet from the garage
door and 50-60 feet from the house."  Id.  From this vantage
point, the officer detected the odor of growing marijuana

emanating from the house.  Id. at 1426.  The officers thereafter obtained a search warrant based on the informant's tip regarding "Pepe" and the officer's belief that he smelled marijuana at the defendant's residence.  Id.  Upon executing the warrant, the officers seized unregistered firearms and more than 1,000 marijuana plants.  Id.  The defendant moved to suppress the evidence found in his house on the ground that the original, warrantless observations by the officer who visited his property violated the Fourth Amendment.  Id.  The district court denied the motion to suppress, concluding that the area in which the officer smelled marijuana was outside the curtilage of the defendant's home.  Id. at 1427.

23.  On appeal, the Ninth Circuit reversed, noting that the district court "failed to accord sufficient weight to . . . [the officer's] lack of objective data indicating that [the defendant's] garage or driveway was not used for intimate activities of the house."  Id.  On this point, the Ninth Circuit found it significant that the officer "had no objective data indicating that [the defendant] used his garage or adjacent driveway area for illegal activity rather than for those activities associated with the privacies of domestic life."  Id. (emphasis in original).  The court also noted that the "tip from an informant that 'Pepe' aided Levine in launching his marijuana operation is not sufficient, standing alone, to imply that [the

defendant] was engaging in illegal activity at his home." Id. at
1428.

24.   Before the FBI agents began searching Gilman's
property, they had no objective information about the shed.  On
this ground alone, this factor weighs in favor of finding that
the shed falls outside the curtilage of the home.  See Johnson,
256 F.3d at 903 ("Dunn requires that when determining the 'use'
of an area, the officers cannot rely, as was done in this case,
exclusively on information they learn after the search begins.").

25.   However, even if the court considers the
information the agents learned before entering the shed, this
factor still weighs in favor of finding that the shed is not part
of the curtilage.  After the search of Gilman's property began
but before the agents entered the shed, Gilman told them that the
shed was used to store his tools.  At that time, sensor lights,
electrical outlets, an electrical box, and a telephone box were
all visible to agents on the outside of the shed, indicating that
the shed may have had electricity and a working telephone.  A
trash can, a chair, two hoses, and several plants were also
directly outside of the shed.  See Government's Exhibit 5.  The
agents could see that the shed had high windows, that the
"numbers '67-423' were affixed to the front of the shed," and
that "the residence and the shed were painted in the same green
color with white trim."  Opp. at 10.  Even this information is

insufficient for the officers to know whether the shed was "associated with the activities and privacies of domestic life." Cf. Dunn, 480 U.S. at 303.  Storing tools in the shed does not convert the shed into curtilage of the home.  See, e.g., Santa Maria, 15 F.3d at 883.  Further, the observable circumstances--i.e., the chair and plants outside the shed and the shed's high windows, sensor lights, and electrical outlets and possible electricity and telephone--indicate that the shed may have been used for domestic activities.  See Dunn, 480 U.S. at 303.  The officers simply had no objective data indicating that Gilman used the shed "for illegal activity rather than for those activities associated with the privacies of domestic life." Depew, 8 F.3d at 1427; see also Johnson, 256 F.3d at 903; Traynor, 990 F.2d at 1158.  This factor therefore weighs in favor of finding that the shed is not part of the curtilage of Gilman's home.  See Johnson, 256 F.3d at 903.

    The Fourth Dunn Factor:  Steps To Prevent Observation

    26.  With respect to the fourth Dunn factor, Gilman argues that he "did little to protect the shed area from observation by those standing outside of his property."  Motion at 7.  He says the shed is completely visible from all sides of his property and that no fence or vegetation obstructs the shed. Motion at 7.  The Government contends that Gilman "took steps to prevent observation of the activity/contents of the shed," but

that "[a]nyone passing by [his property] would see [his] residence and the shed." Opp. at 12. Because Gilman did not take any steps to prevent observation of the shed from passers-by, this factor weighs in favor of finding that the shed is not part of the curtilage of Gilman's home.

27. The fourth Dunn factor "focuses on the steps taken by [the defendant] to prevent observation of the area from passers-by." Johnson, 256 F.3d at 903. Where fences are alleged to protect an area from passers-by, courts focus on the purpose of the fence and whether it actually obstructs viewing the area. See, e.g., Dunn, 480 U.S. at 303 ("Respondent did little to protect the barn area from observation by those standing in the open fields. Nothing in the record suggests that the various interior fences on the respondent's property had any function other than that of the typical ranch fence; the fences were designed and constructed to corral livestock, not to prevent persons from observing what lay inside the enclosed areas."); Johnson, 256 F.3d at 918 ("His fences restricted access but they did not block visibility. While the locked shed may have sheltered the marijuana garden inside, there was nothing to stop the officers from observing the area outside the shed.") (Kozinski, J., concurring).

28. The photographs of Gilman's property show that the shed is visible from areas off of the property. Exs. B-E; see

Shates, 915 F. Supp. 1483 (noting that the court focuses on "visibility from points off of the property"). According to Gilman, "Nothing protects the shed area from observation by those standing outside of the property; there is no fence or any natural obstruction. The shed is visible from all sides of the property." Gilman 12/26/2006 Decl'n ¶ 6. The Government also concedes that "[a]nyone passing by [Gilman's property] would see [his] residence and shed." Opp. at 12. Because the evidence before the court indicates that Gilman took no steps to prevent observations of the shed from passers-by, this factor weighs in favor of finding that the shed is not part of the curtilage of Gilman's home.

        Analysis of All Four Dunn Factors

        29.   The four Dunn factors "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration--whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Dunn, 480 U.S. at 1140. In the present case, the substantial distance between the shed and the home, the absence of any enclosure surrounding the home and/or shed, the lack of objective data by the agents regarding whether the shed was used for illegal activities, and Gilman's failure to protect the shed from observation indicate that the shed is not so intimately tied to

24

Gilman's home that it should be placed under the home's umbrella of protection.  See id.  Therefore, contrary to the Government's position, the shed does not fall within the curtilage of Gilman's home and was not covered by the warrant.  Because the court rejects the Government's only argument[2] against suppressing the evidence and because the Government takes no other position against suppression, the court suppresses all evidence seized from the shed.

B.   The "Good Faith" Exception.

30.  At the hearing on the present motion, the Government mentioned for the first time that it relies on the "good faith" exception to the exclusionary rule.

31.  In United States v. Leon, 468 U.S. 897, 922 (1984), the Supreme Court held that evidence obtained pursuant to a facially valid search warrant that is later found to be invalid is admissible if the executing officers acted in good faith and in objectively reasonable reliance on the warrant.  United States v. Hove, 848 F.2d 137, 139 (9th Cir. 1988) (citing Leon, 468 U.S. at 922); see also United States v. Luong, 470 F.3d 898, 902 (9th Cir. 2006).  "The Leon test for good faith is clearly an objective one."  Hove, 848 F.2d at 140; see also Luong, 470 F.3d

---

[2] As discussed in the next section, the Government did mention the "good faith" exception to the exclusionary rule at the hearing on this matter, but provided no argument or evidence in support of the exception's application to this case.

at 902.  Courts ask "not what the executing officer believed, or could have believed, but 'whether a reasonably well trained officer would have known that the search was illegal.'" <u>Luong</u>, 470 F.3d at 902.  The Government bears the burden of proving that the officer's reliance on the warrant was objectively reasonable. <u>United States v. Kow</u>, 58 F.3d 423, 428 (9th Cir. 1995).

        32.  Initially, the court notes that the Government did not address the exception in its opposition memorandum, and at the hearing, the Government presented no argument or evidence in support of its assertion that the exception applies in this case. The Government did not, for example, have Agent Rutherford address this issue while he was on the stand.  Without any argument or evidence on this point, the Government fails to meet its burden of establishing that the agents' actions were objectively reasonable.  <u>See</u> <u>Kow</u>, 58 F.3d at 428.

        33.  Moreover, even if the Government could be said to have fairly raised this argument, neither applicable law nor the record would support a determination that the exception applies. This court recognizes, of course, that in <u>Gorman</u>, 104 F.3d at 275-76, a case originating in this district before a different district judge, the Ninth Circuit relied on the good faith exception as an alternative ground for reversing the district court's order of suppression.  In that case, Honolulu police officers obtained a warrant to search a bus that the defendant

was living in.  The officers were looking for marijuana and other drugs.  When the warrant was executed, one of the officers "noticed a large plastic translucent jar partly buried beside some lawn chairs outside the bus-residence."  Id. at 274.  The officer picked up and opened the jar, finding "bullets, blasting caps, and a loaded .32 caliber revolver" in it.  Id.  As a result of the discovery, the defendant was charged with being a felon in possession of a firearm.  Id.  The defendant moved to suppress the gun, and the district court granted the motion on the ground that, although "the jar and gun were within the bus-residence's curtilage, the warrant on its face authorized a search of only the bus, not the bus's curtilage."  Id.

34.  On appeal, the Ninth Circuit reversed, holding that the curtilage was covered by the warrant authorizing a search of a residence and that the jar could therefore be searched under the warrant.  Id. at 275.  Alternatively, the court relied on the good faith exception:

> Finally, even if we were to decide that the curtilage was not included within the scope of the warrant, we would not apply the exclusionary rule here.  The exclusionary rule is designed to deter police misconduct; it should not be applied to deter "objectively reasonable law enforcement activity."  Leon, 468 U.S. at 919, 104 S. Ct. at 3418.  Here it would be objectively reasonable for law enforcement officials to believe that the curtilage search was authorized by the warrant.  Every published opinion addressing the issue has concluded that a warrant authorizing the search of a

> residence automatically authorizes a search
> of the residence's curtilage.  Accordingly,
> even if we had decided that the curtilage was
> not part and parcel of the home, we would not
> exclude the gun.  See United States v.
> Dahlman, 13 F.3d 1391, 1397 (10th Cir. 1993)
> (although warrant was overbroad, evidence
> would not be excluded because officer's
> interpretation was consistent with precedent
> from other circuits) cert. denied, 511 U.S.
> 1045, 114 S. Ct. 1575, 128 L. Ed. 2d 218.

Id. at 275-76 (some internal citations omitted).

35.  Gorman is distinguishable from the present case.

First, Gilman's shed falls outside the curtilage, whereas the jar

in Gorman "was inseparable for privacy purposes from the bus-

residence identified in the warrant."  Gorman, 104 F.3d at 275.

Thus, it was not objectively reasonable for agents to believe

that the shed was covered by the warrant.  Second, the issue in

Gorman that the officers could have relied on is not the issue

here.  In Gorman, the district judge was examining whether the

warrant covered the curtilage, a matter on which the officers

could look to pre-existing law.  Here, the parties agree that the

warrant covered the curtilage but dispute what falls within the

curtilage.  Pre-existing law makes it clear that determining what

the curtilage is in any particular case involves a case-by-case

analysis.  Dunn, 480 U.S. at 301; Depew, 8 F.3d at 1426.  Given

the fact-based nature of any curtilage determination, an

objectively reasonable officer would not have assumed the shed

was automatically within the curtilage of the house.

36.   Indeed, an objectively reasonable officer would
have been concerned about whether the warrant covered Gilman's
shed.  As mentioned above, Special Agent McDonald's application
and affidavit for the present search warrant also sought a
warrant to search William Gilman's residential property.
Regarding William Gilman, Special Agent McDonald stated, "I
believe that William Gilman stores at his residence much of the
equipment used for the chicken fights and gambling activities,
including but not limited to tents, lights, tables and other
furniture."  Warrant Application at 26.  Special Agent McDonald
also averred that "the probable cause to believe that William
Gilman is in possession of the equipment used at the chicken
fights is based in part on surveillance conducted on June 14,
2005."  Warrant Application at 26-27.  Additionally, a
confidential informant told the FBI that "[m]uch of the equipment
used at the Waialua chicken fight and gambling arena is stored at
the residence of William Gilman, including tents, lights,
furniture, and flooring for the arena."  Warrant Application
at 43.  Because individuals involved in illegal gambling
operations often store evidence in "vehicles, residences and
businesses," as well as in "other structures and areas on the
property . . . , for example, outbuildings, garages, sheds, yard
areas, trash containers, storage areas, inoperable vehicles, and
containers," the warrant to search William Gilman's residence

expressly authorized a search of "all carports, sheds and tents adjacent to the house."  Warrant Application at 6-8, 54.

37.  Although the same application and affidavit supported the warrant to search Gilman's property, Special Agent McDonald did not state any belief that any "[e]quipment used for the chicken fights and gambling business" might be stored at Gilman's property.  Additionally, unlike the warrant to search William Gilman's property, the warrant to search Gilman's residence did not expressly authorize the search of any "sheds" on Gilman's property.  See Warrant Application at 54.

38.  Clearly, the warrant to search William Gilman's property was supported by probable cause that gambling equipment would be stored there, and the warrant authorized a search of "sheds."  The warrant to search Douglas Gilman's property was not supported by any probable cause regarding any shed, and the warrant did not authorize a search of any shed.  Based on the application supporting the two warrants and on the differing language of the warrants, a reasonable officer executing the warrants would have believed that a shed on William Gilman's property was covered by the warrant, but that any shed on Gilman's property was not covered by the warrant.  Accordingly, even if the court considered the Government's Leon argument, the court would conclude that the good faith exception does not apply in this case.

30

C.   <u>Gilman's Alternative Argument.</u>

39.   In addition to arguing that the shed falls outside the curtilage of his home, Gilman argues that even an area outside the curtilage is protected by the Fourth Amendment if one has a legitimate expectation of privacy in the area.   Motion at 8.   The Government does not address this argument at all, apparently agreeing with it and relying only on its curtilage analysis.

40.   At first glance, Gilman's argument appears to cut against Ninth Circuit law suggesting that areas or outbuildings falling outside the curtilage of a home are automatically unprotected by the Fourth Amendment.   <u>United States v. Soliz</u>, 129 F.3d 499, 503 (9th Cir. 1997) ("The district court did not clearly err in finding that the parking area was not curtilage. Thus, there was no Fourth Amendment violation."), <u>overruled on other grounds by</u> <u>Johnson</u>, 256 F.3d at 913 n.4; <u>Van Damme</u>, 48 F.3d at 465 ("In this case, the observation was made from . . . outside the curtilage, so . . .  the Fourth Amendment did not entitle [the defendant] to privacy from the observation."); <u>United States v. Brady</u>, 993 F.2d 177, 179 (9th Cir. 1992) ("Because the district court did not clearly err in finding that the outbuilding is not within the curtilage, we affirm the district court's determination that no Fourth Amendment violation occurred."), <u>overruled on other grounds by</u> <u>Johnson</u>, 256 F.3d at

913 n.4; Traynor, 990 F.2d at 1159 (noting that, because the shop
was part of the curtilage of the defendant's home, "there was no
Fourth Amendment violation"); cf. Madruga v. County of Riverside,
431 F. Supp. 2d 1049, 1056 (C.D. Cal. 2005) (The initial question
becomes whether the courtyard to the Madrugas' home was part of
the home's curtilage.  If not, then Deputy Smith's entry upon it
does not run afoul of the Fourth Amendment.").

          41.  These cases are based on the premise that an area
that is not part of the curtilage of a home must be an open field
and therefore not protected by the Fourth Amendment.  Accord
United States v. McIver, 186 F.3d 1119, 1126 (9th Cir. 1999)
("only the curtilage, not the neighboring open fields, warrants
the Fourth Amendment protections that attach to the home"
(quoting Oliver v. United States, 466 U.S. 170, 180 (1984))); cf.
United States v. Davis, No. CR 04-300064-AA, 2006 WL 1491449, at
*4 (D. Or. May 24, 2006) ("While the Fourth Amendment recognizes
a legitimate expectation of privacy in the home, the zone of
protection does not extend to 'open fields' beyond the boundary
of the home's curtilage."); Dellas, 355 F. Supp. 2d at 1101
("What lies beyond the boundary of the curtilage are 'open fields
that government agents may enter without regard to the
constraints imposed by the Fourth Amendment.'").

          42.  To further complicate the issue, it is not clear
what qualifies as an open field.  If a structure, for example,

can be an open field, it may be that the structure must not
appear too solid.  Compare United States v. Broadhurst, 805 F.2d
849, 855 n.9 (9ᵗʰ Cir. 1986) (suggesting that structures cannot
be "open fields") with Van Damme, 48 F.3d at 464-65 (suggesting
that a greenhouse falling outside the curtilage was an "open
field").

        43.  In parsing the law of open fields, this court
finds support for Gilman's position in Ninth Circuit case law
that suggests that areas beyond the curtilage of a home are not
necessarily open fields, but may instead be part of a third
category.  For example, in Santa Maria, 15 F.3d at 880, border
patrol agents looking for aliens and drugs near the Mexican
border followed fresh tracks to the defendant's property.  The
agents went onto the defendant's property without a warrant and
followed the tracks to a trailer near the defendant's mobile
home.  Id.  The agents informed the defendant that they were
searching for drugs, and the defendant unlocked the trailer for
them.  Id.  In the trailer, the agents found burlap bags
containing 357 pounds of marijuana.  Id. at 880-81.  After
arresting the defendant, the agents searched his mobile home,
where they found more burlap bags and rope used for carrying
bundles of marijuana.  Id. at 881.

        44.  The defendant in Santa Maria moved to suppress the
evidence found in his trailer and mobile home, and the district

33

court denied the motion.  Id.  On appeal, the Ninth Circuit

described the trailer as "a locked unit which housed tools, a

chainsaw, and an aquarium in addition to burlap sacks of

marijuana" and stated that it was "outside the curtilage."  Id.

at 883 n.2.  The court stated, however, that a "structure need

not be within the curtilage in order to have Fourth Amendment

protection."  Id. at 882.  The court also noted that "we have no

trouble concluding that the trailer is not an 'open field.'"  Id.

at 883 (internal footnote omitted).  Because the Ninth Circuit

concluded that there was "no statutory basis for the search" and

that the defendant did not consent to the search, the court held

that "the search violated the Fourth Amendment" and suppressed

all evidence seized from the trailer and the mobile home.  Id. at

883.  In other words, the court concluded that the trailer was

neither part of the curtilage nor an open field, but nevertheless

suppressed the evidence.

          45.  Drawing on Santa Maria, the Ninth Circuit, in Van

Damme, 48 F.3d at 465, stated:

          it is well established that Fourth Amendment
          protection applies to enclosed places which
          are not "persons, houses, papers, and
          effects," such as . . . a trailer outside the
          curtilage used as a storage shed, United
          States v. Santa Maria, 15 F.3d 879 (9th Cir.
          1994).

In Broadhurst, 805 F.2d at 855 n.7, the Ninth Circuit also

similarly noted:

> It is clear . . . that a structure need not
> be within the curtilage in order to have
> Fourth Amendment protection.  Indeed, so long
> as a person may claim a legitimate
> expectation of privacy in a structure or
> item, Fourth Amendment protection extends to
> that structure or item.

Under these cases, Gilman's shed is protected by the Fourth

Amendment, and suppression is warranted "so long as [he] may

claim a legitimate expectation of privacy in" the shed.  See id.

46.  The Government conceded at the hearing that Gilman

has a legitimate expectation of privacy in his shed.  As the

Government has not argued that the shed is an "open field,"

suppression of evidence seized from the shed is appropriate under

Santa Maria, Van Damme, and Broadhurst.

IV.     CONCLUSION.

In light of the foregoing, the motion to suppress is

granted.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 2, 2007.

_____
Susan Oki Mollway
United States District Judge

United States v. Douglas Gilman, Jr., et al., Cr. No. 06-00198 SOM; ORDER
GRANTING DEFENDANT'S MOTION TO SUPPRESS ITEMS OF EVIDENCE.